William Lee WRIGHT, et al., Plaintiffs,

v.

The FRED HUTCHINSON CANCER RESEARCH CENTER, et al., Defendants.

No. C01–5217L.

United States District Court, W.D. Washington, At Seattle.

Aug. 8, 2002.

Order Denying Reconsideration Aug. 28, 2002.

Alan C. Milstein, Harris L. Pogust, Sherman Silverstein Kohl Rose & Podolsky, Pennsauken, NJ, David Elliot Breskin, Short Cressman & Burgess, Seattle, WA, Thomas Randolph Dreiling, Seattle, WA, for Plaintiffs.

Barbara F. Mishkin, George H. Mernick, III, Jonathan S. Franklin, Joseph M. Hassett, Hogan & Hartson, Washington, DC, David B. Robbins, Michael Madden, William James Leedom, Bennett Bigelow & Leedom PS, Seattle, WA, for Defendants.

Christopher S. McNulty, Mundt MacGregor LLP, Jay H. Zulauf, Hall Zanzig Zulauf Claflin, Bruce E.H. Johnson, Jeffrey L. Fisher, Davis Wright Tremaine LLP, Seattle, WA, for Interested Parties.

## ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT AS TO CAUSES OF ACTION ONE—FOUR

LASNIK, District Judge.

This matter comes before the Court on the "Hutchinson Defendants' Motion for Judgment on the Pleadings as to Plaintiffs' Causes of Action One Through Four." The parties agree that the standard by which defendants' Rule 12(c) motion is to be evaluated is the same standard that is used to decide motions under Fed.R.Civ.P. 12(b)(6). The Court therefore accepts as true the allegations of plaintiffs' Second Amended Complaint for Damages and views them in the light most favorable to plaintiffs. A motion for judgment on the pleadings will not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted).

The Fred Hutchinson Cancer Research Center ("the Hutch"), E. Donnall Thomas, John A. Hansen, Paul J. Martin, and Robert Day seek dismissal of plaintiffs' First, Second, Third, and Fourth Causes of Action. Those causes of action assert breaches of the right to be treated with dignity, violations of federal regulations, breaches of the Assurance Agreement between the Hutch and the Department of Health and Human Services, and violations of 42 U.S.C. § 1983 and § 1985 respectively. Each of these claims is considered below.

### First Cause of Action: Breach of the Right to be Treated with Dignity

Although the First Cause of Action appears to set forth a distinct claim for the breach of a right created by the Nuremberg Code and the Declaration of Helsinki, plaintiffs now assert that the precepts set forth in those documents are simply evidence of this country's recognition that certain rights are fundamental under the due process clause of the Fourteenth Amendment. Plaintiffs have disavowed any private right of action under the Nuremberg Code and/or the Declaration of Helsinki (*see* Response at 9) making judgment on the First Cause of Action appropriate. These documents will be considered, however, in ruling on plaintiffs' substantive due process claim under § 1983.

**Second Cause of Action: 21 C.F.R. §§ 210—211, 21 C.F.R. §§ 601 and 610, and 45 C.F.R. § 46**

Plaintiffs' Second Cause of Action asserts violations of federal regulations, namely 21 C.F.R. §§ 210—211, 21 C.F.R. §§ 601 and 610, and 45 C.F.R. § 46, which regulate the manufacture and control of investigational biological drugs used in clinical trials and establish certain protections for human research subjects at institutions such as the Hutch. Plaintiffs have apparently abandoned their attempt to bring a cause of action directly under the federal regulations and now assert that such regulations are enforceable through an action under § 1983 of the Civil Rights Act. Response at 27. Section 1983 provides a remedy for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. "In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (emphasis in original).

▆▆ Only Congress can create new rights enforceable under § 1983: agency regulations cannot give rise to a private cause of action where the authorizing statute does not confer such a right. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 2279, 153 L.Ed.2d 309 (2002) ("if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms"); *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."). Even the case on which plaintiffs rely, *San Lazaro Ass'n. Inc. v. Connell,* 278 F.3d 932, 941 (9th Cir.2002), evaluated the enforceability of rights created by a federal statute, not federal regulations, and clearly indicates that the intent of Congress, not the intent of the regulatory agency, governs the outcome of the analysis. Because plaintiffs have not identified any statutory basis for the private rights of action they seek to assert, their claims under 21 C.F.R. §§ 210—211, 21 C.F.R. §§ 601 and 610, and 45 C.F.R. § 46 must fail.

▆▆ Even if the Court were to assume that agency regulations could establish a federal right enforceable under § 1983, the regulations at issue here do not meet the *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), criteria or the recent pronouncement of the Supreme Court in *Gonzaga Univ.* First, the regulations are not "phrased in terms of the persons benefitted." *Cannon v. University of Chicago,* 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Rather, they require action on the part of research institutions such as the Hutch (45 C.F.R. § 46.103), investigators such as the individual defendants (45 C.F.R. § 46.116), manufacturers of biological and drug products (21 C.F.R. §§ 211.25 and 211.180, 21 C.F.R. §§ 601.2 and 610.1), and the heads of various governmental departments and agencies (21 C.F.R. § 601.5, 45 C.F.R. § 46.122). Where a statute is not focused on the individual benefitted, the courts "rarely impute to Congress an intent to create a private right of action." *Gonzaga Univ.,* 122 S.Ct. at 2275 n. 3. Second, the regulations are designed to control the aggregate behavior of research facilities, investigators, and drug manufacturers by subjecting them to overarching standards of conduct. Particularly with respect to 45 C.F.R. § 46, *de minimis* violations of the regulations appear to be of little concern to the regulating agency: only "material" failures to comply will result in sanctions. *See* 45 C.F.R. § 46.123. Such regulations are not concerned with "whether the needs of any particular person have been satisfied" and they do not, therefore, give rise

to an individual right. *Blessing*, 520 U.S. at 343, 117 S.Ct. 1353. Finally, the enforcement sections of the regulations provide for regulatory action. *See* 21 C.F.R. § 210.1(b), 45 C.F.R. § 46.122. Although such regulatory enforcement mechanisms do not explicitly preclude simultaneous enforcement through private litigation, they counsel against finding an intent to create individually enforceable private causes of action. *Gonzaga Univ.*, 122 S.Ct. at 2278–79.[1]

### Third Cause of Action: The Belmont Report: Breach of the Assurance Agreement

Plaintiffs assert that they are third-party beneficiaries to a contract between the Hutch and the Department of Health and Human Services in which the Hutch agreed to follow certain guidelines for the ethical conduct of research involving human subjects, to abide by all federal regulatory requirements for such research, and to present all such research to an Institutional Review Board for approval. As pointed out by defendants, however, "[p]arties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir.), *cert. denied*, 531 U.S. 812, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000) While

human subjects of research conducted at the Hutch would clearly benefit from defendants' compliance with the Assurance Agreement, plaintiffs have not identified any language in or provision of the Agreement that provides subjects with an actionable right, a fact which is sufficient to rebut the contention that plaintiffs are intended beneficiaries. *Klamath*, 204 F.3d at 1211.

### Fourth Cause of Action: Violation of 42 U.S.C. § 1983 and § 1985

As discussed above, § 1983 of the Civil Rights Act provides a remedy for the deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. Plaintiffs allege deprivations of their rights to substantive and procedural due process under the Fourteenth Amendment.[2] Defendants assert that they are entitled to qualified immunity from suit because their conduct did not violate clearly established constitutional or statutory rights of which a reasonable person would have known during the period 1981 to 1993. Both plaintiffs' claims and defendants' defense require the Court to first consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendants'] conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).[3]

---

1. This analysis is bolstered by the fact that Congress contemplated, but ultimately rejected, a statutory mechanism for the compensation of individuals and their families for injuries resulting from their participation in human subjects research. S. Rep. No 93–381, at 90 (1973).

2. In light of the procedural posture of this motion, the Court will accept as true plaintiffs' allegations that defendants were acting under the color and authority of state law for purposes of the § 1983 analysis.

3. In an effort to prevent constitutional law from stagnating, the Supreme Court insists that the trial court determine whether defendants' conduct violated a constitutional right before determining whether the constitutional right was clearly established at the time of plaintiffs' injury. Without such a two-part analysis, individual rights would be frozen in time as each reviewing court simply determined whether or not defendants' conduct had been found unconstitutional in the past. By first evaluating the constitutional claim on its merits, constitutional rights may develop over time even if the defendant in a particular

■ The due process clause of the Fourteenth Amendment provides that no state shall "deprive a person of life, liberty, or property without due process of law." Due process has two components; one procedural, one substantive. Procedural due process requires that the state use fair and adequate procedures in connection with the deprivation of a constitutionally protected liberty or property interest. "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (internal quotations omitted). To determine whether a state's procedures for affecting a deprivation are constitutionally adequate, the Court must consider the private interest that will be affected by the state action, the risk of an erroneous deprivation under existing procedures and the relative value, if any, of additional procedural safeguards, and the state's interest in the state action and in avoiding excessive administrative/procedural burdens. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

For purposes of this analysis, the Court assumes that plaintiffs' decedents were deprived of life and/or a constitutionally protected liberty interest. The relevant inquiry, therefore, is whether the procedural safeguards included in the informed consent process were constitutionally adequate. Plaintiffs do not challenge the adequacy of the statutory or regulatory protections provided for human subjects of investigational research. Nor do plaintiffs challenge the overall informed consent process established by the Hutch and its

Investigational Review Board. Their claim is not that these procedures were inadequate, but that they were not followed by defendants when they intentionally withheld information and/or interfered with the IRB review process. The adequacy of the process that is due, however, is not dependant on whether defendants violated the state's established procedures. The due process clause requires that the state provide constitutionally adequate procedures: it does not guarantee their flawless implementation in every instance.

Plaintiffs' allegations that their decedents were not provided with all of the information necessary to understand the proposed treatment, the possible risks and benefits of the research protocols, or defendants' financial interests and that defendants interfered with the proper workings of the IRB do not state a § 1983 claim under the Supreme Court's decisions in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (*rev'd on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)), *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393, (1984), and *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The *Parratt/Hudson* doctrine provides that a random, unauthorized deprivation of a protected interest, whether negligently or intentionally done, does not violate due process as long as the state furnishes an adequate post-deprivation remedy. The Court reasoned that situations involving a deprivation caused by random and unauthorized acts of state officials in contravention of established state procedures cannot be predicted, making it virtually impossible to provide the type of predeprivation

case is immune from suit because the right found to have been violated was not clearly established. If similar conduct should occur in the future, the earlier finding that the conduct implicated a constitutional right would ensure that the later defendant would be held responsible and would not be entitled to qualified immunity.

notice and hearing that are generally required. *Parratt*, 451 U.S. at 541, 101 S.Ct. 1908; *Hudson*, 468 U.S. at 533, 104 S.Ct. 3194. In such circumstances, the "meaningful post-deprivation remedy" provided by state tort law is all the process that is due. *Parratt*, 451 U.S. at 544, 101 S.Ct. 1908. The Supreme Court reinforced this doctrine in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), where it held that the *Parratt* rationale applies only when the injury is caused by a failure to follow established, adequate state procedures. Where the state procedures themselves operate in such a way as to deprive individuals of life, liberty, or property without due process, a § 1983 action will lie.

The *Parratt/Hudson* doctrine was modified in *Zinermon*. In that case, the plaintiff alleged that staff members at a Florida mental hospital deprived him of his liberty without due process by admitting him to the hospital under a "voluntary" commitment procedure when they knew or should have known that he was incompetent to sign the admissions forms. The statute creating the voluntary commitment procedure specifically required informed consent. Although the plaintiff disavowed any challenge to the procedures established by state law and instead acknowledged that had the staff members followed those procedures he would have received all the process that was due under the Constitution, the Supreme Court found the statutory scheme deficient in that it did not specifically require staff members to determine, in the first instance, whether a person is competent to give the required informed consent. *Zinermon*, 494 U.S. at 135, 110 S.Ct. 975. Because of this procedural defect, the Court found that the erroneous commitment of incompetent individuals was foreseeable and might have been avoided had there been additional procedural safeguards. *Zinermon*, 494 U.S. at 135–37, 110 S.Ct. 975.

■ The import of *Zinermon* is not entirely clear. The Court did not abandon the *Parratt/Hudson* doctrine, but it scrutinized defendants' claim that the actions were unauthorized and unforeseeable to determine whether the rationale of *Parratt/Hudson* should govern. Applying the triad of cases to the facts presented here, the Court must first determine whether the deprivation alleged by plaintiffs was truly unpredictable or unforeseeable. *See Zinermon*, 494 U.S. at 136, 110 S.Ct. 975. Plaintiffs complain that their decedents' rights were violated because defendants, acting on behalf of the state, failed to obtain informed consent in violation of state law, federal regulations, and contractual/policy obligations. It is difficult to imagine how the state could any more predict that its agents would disregard governing law, policy, and practice regarding informed consent than that a prison guard might destroy an inmate's personal belongings. The Court therefore finds that the deprivation plaintiffs allege was, from the viewpoint of the state, unforeseeable.

The second inquiry under the modified *Parratt/Hudson* doctrine is whether additional predeprivation procedures would have decreased the risk of an alleged erroneous deprivation. *See Zinermon*, 494 U.S. at 136–38, 110 S.Ct. 975. The procedures and laws that govern human subjects research already require informed consent: additional requirements of the same type would do very little good. Similarly, a state rule directing defendants to hold a hearing before failing to provide information necessary to informed consent would be senseless. See *Katz v. Klehammer*, 902 F.2d 204, 207 n. 1 (2nd Cir.1990).[4]

---

4. If plaintiffs are, in fact, challenging the adequacy of the procedures and laws governing informed consent, there are a number of additional procedural safeguards which could be, but are not, required by the state in an at-

Finally, the Court must determine whether defendants' conduct in allegedly violating established procedures was somehow "authorized." *See Zinermon,* 494 U.S. at 138, 110 S.Ct. 975. *Zinermon* held that where the state has delegated the authority to deprive liberty or property to particular employees or agents, their actions amount to "authorized" acts and are thus not "random and unauthorized" as required in *Parratt. See also Zimmerman v. City of Oakland,* 255 F.3d 734, 739 (9th Cir.2001). In *Zinermon,* the Court emphasized that certain professionals at the mental hospital did, in fact, have broad authority to deprive individuals of liberty when certain criteria were met and that they were the only ones who could ensure that the state procedure for admitting incompetent patients was properly followed. The Supreme Court reasoned that, given this broad delegation of power, the staff members had authority to deprive individuals of their liberty with or without complying with the governing statutes. *Zinermon,* 494 U.S. at 138, 110 S.Ct. 975. Unlike the state mental hospital personnel in *Zinermon,* who were delegated the choice of whether or not to initiate pre-commitment hearings (and consequently, the authority to deprive patients of their liberty without following the state procedure for involuntary commitments), defendants in this case were given no choice to make. All governing statutes, regulations, policies, and procedures require informed consent: defendants had a legal obligation to obtain that consent before enrolling plaintiffs' decedents in Protocol 126. Therefore, it cannot be said that the state "authorized" its agents to disregard the established procedures in the instant case.

Because the distinctions that kept the Supreme Court from applying the *Parratt/Hudson* doctrine in *Zinermon* are not present in this case, that doctrine governs plaintiffs' claims. Plaintiffs would therefore have a § 1983 claim for violation of procedural due process only if the state's post-deprivation remedies are inadequate. Washington's relevant tort claims provision, RCW 7.70.050, provides a damages remedy to persons who have suffered from the state's failure to obtain informed consent. Plaintiffs have not challenged the adequacy of that provision and have, in fact, asserted a claim thereunder. Given the existence of postdeprivation remedies that are adequate to cure what would otherwise be an unconstitutional deprivation of "life, liberty or property," plaintiffs can allege no set of facts that would entitle them to relief under a procedural due process theory. *Hudson,* 468 U.S. at 533, 104 S.Ct. 3194.

Although the case law regarding procedural due process claims is still developing, the above analysis maintains the important distinctions between constitutional violations and state law torts. The *Parratt/Hudson* doctrine was meant to pre-

tempt to ensure that a patient's consent to treatment is truly informed. For example, the state could require that every investigator and potential participant in an investigational study come before a judicial officer to ensure that all relevant information has been disclosed and that consent is freely and knowingly given. Such proceedings are commonly held where an individual is involuntarily committed to a medical institution or a defendant pleads guilty to a crime. The fact that such additional safeguards are possible does not mean they are constitutionally mandated, however. Pursuant to *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court must consider the probable value of such safeguards and weigh them against the fiscal and administrative burdens they would impose on the government. Plaintiffs have not suggested, and the Court has not been able to imagine, any additional procedural safeguards which would not unnecessarily and unacceptably increase the state's burden (not to mention infringe on the patients' privacy interests).

vent the Fourteenth Amendment from becoming a "font of tort law to be superimposed upon whatever systems may already be administered by the States." *Parratt,* 451 U.S. at 544, 101 S.Ct. 1908. Section 1983 must be preserved as a remedy for those deprivations which the state accomplishes without adequate process of law, such as when a state, through its legislature or authorized policymaker, consciously decides to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of state employees who are acting in direct contravention of state policies, procedures, and requirements that were designed to guarantee the rights of its citizens.

Because defendants' alleged actions in failing to obtain informed consent were random and unauthorized and because there are adequate post-deprivation remedies for their alleged conduct, plaintiffs' Fourteenth Amendment procedural due process rights were not violated and their related § 1983 claim must be dismissed.

■ Substantive due process protects individuals from certain arbitrary, wrongful, government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Rights are protected under the due process clause if they are "so rooted in the tradition and conscience of our people as to be ranked as fundamental" or if such rights reflect "basic values implicit in the concept of ordered liberty" such that "neither liberty nor justice would exist if they were sacrificed."*Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Griswold v. Connecticut,* 381 U.S. 479, 500, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934).

For purposes of this analysis, the Court is willing to assume that most, if not all, citizens of the United States would recoil in horror from the idea that our government could conduct the type of involuntary, non-therapeutic research on human subjects that gave rise to the Doctors Trial following World War II. As the cases cited by the parties show, however, such experimentation has occurred in this country with disturbing regularity. The judiciary has not hesitated to find that, where the human research subjects were not told that they were participating in an experiment and/or the government conducted the experiments knowing they had no therapeutic value, the subject's constitutionally protected right to life and/or liberty had been violated. *See, e.g., Heinrich v. Sweet,* 62 F.Supp.2d 282 (D.Mass.1999) (government utilized false pretenses to lure plaintiffs into participating in radiation experiments which the government knew had no therapeutic value); *Stadt v. University of Rochester,* 921 F.Supp. 1023 (W.D.N.Y. 1996) (plaintiff, who thought she was receiving medical treatment for scleroderma, was injected with plutonium without her knowledge or consent); *In re Cincinnati Radiation Litig.,* 874 F.Supp. 796 (S.D.Ohio 1995) (plaintiffs were not informed that the radiation they were receiving was part of a military experiment rather than treatment of their cancer).

In a stirring dissent in *United States v. Stanley,* 483 U.S. 669, 709–10, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), Justice O'Connor argued that, where there are no other viable avenues of redress, the United States Constitution must act as a last barrier between the citizens and a government which sees them as no more than guinea pigs. During his years of service in the United States Army, Master Sergeant Stanley agreed to participate in a research program ostensibly designed to test the effectiveness of protective clothing and

equipment in chemical warfare. Unbeknownst to him and without his consent, Stanley was secretly administered doses of lyseric acid diethylamide ("LSD") to determine its effects on humans. The majority of the Supreme Court found that Stanley had no cause of action because the unique disciplinary structure inherent in military life and Congress' establishment of a military justice system counseled against allowing a serviceman to seek damages in a *Bivens* action. Justice O'Connor, on the other hand, argued:

> In my view, conduct of the type alleged in this case is so far beyond the bounds of human decency that as a matter of law it simply cannot be considered a part of the military mission.... No judicially crafted rule should insulate from liability the involuntary and unknowing human experimentation alleged to have occurred in this case.... If [the government fails to obtain voluntary consent of the human subject] the very least that society can do is to see that the victims are compensated, as best they can be, by the perpetrators. I am prepared to say that our Constitution's promise of due process of law guarantees this much.

*Stanley*, 483 U.S. at 709–10, 107 S.Ct. 3054.

■■■ Unlike the circumstances presented in *Stanley*, *Heinrich*, *Stadt*, and the radiation litigation, the true nature of the experiments in which plaintiffs' decedents took part was not hidden by defendants and the proposed treatment regimen, while unproven, was thought, or at least hoped, to be of benefit to the individual participants. Plaintiffs are asking this Court to find that an individual's voluntary participation in an experimental, therapeutic treatment regimen can give rise to a constitutional violation if the treating physician fails to adequately inform the patient of the risks, benefits, and alternatives to the experimental treatment and/or poten-

tial conflicts of interest unrelated to the treatment regimen itself. Plaintiffs have not alleged that the Protocol 126 series of experiments were designed to do anything other than determine whether certain treatment regimens were effective against the type of cancer from which plaintiffs' decedents suffered. At most, plaintiffs argue that defendants failed to disclose certain important facts regarding the protocol and their own pecuniary interests in the outcome of the experiments, but such failures, even if proven, would not alter the therapeutic nature of the protocol or the fact that plaintiffs' decedents knew they were participating in an experiment. Nor is the nature of the experiments disproven simply because the outcome was not what the researchers expected. Whether the therapies proved to be wildly effective or heart-breaking failures, in the absence of allegations that defendants hid the true nature of the experiments and/or conducted them for non-therapeutic reasons, there is no constitutional claim. Finally, Justice O'Connor's concern that Stanley would be left with no viable avenue of redress if the Supreme Court failed to imply a constitutional cause of action is not at issue in this case: plaintiffs may seek, and have sought, to recover damages under the state's informed consent statute.

Plaintiff has not identified, and the Court has not found any case which has equated lack of informed consent in the medical context with a constitutional violation. The Third Circuit has studiously avoided the issue. *White v. Napoleon*, 897 F.2d 103, 114 n. 4 (3rd Cir.1990) ("[C]ertain torts do not rise to the level of constitutional violations. We do not resolve whether torts of informed consent fall within the rule of these cases."). In the context of a qualified immunity analysis, the Ninth Circuit was willing to assume that the constitutional right to bodily integrity requires full disclosure of informa-

tion regarding the risks of proposed treatment, but distinguished its case from *In re: Cincinnati Radiation Litigation* because "[t]he plaintiffs there alleged that the patients were never told they were part of an experiment but rather believed that they were receiving treatment for cancer. Here, the inmates knew they were serving as experimental subjects rather than receiving treatment." *Bibeau v. Pacific Northwest Research Foundation Inc.,* 188 F.3d 1105, 1112 n. 6 (9th Cir. 1999). Knowledge that one is participating in a human subjects experiment, whether therapeutic or not, is a "crucial" factor in determining whether a constitutional right is at stake.

Keeping in mind the Supreme Court's admonition that courts should exercise judicial restraint when asked to expand the rights protected under the substantive due process clause (*Collins v. City of Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)), the Court finds that the type of wrongful conduct alleged in plaintiffs' Second Amended Complaint, namely defendants' failure to make disclosures necessary to the informed consent process in a therapeutic, experimental setting, does not implicate rights that are so rooted in the tradition and conscience of our people as to be ranked as fundamental. A doctor's tortious failure to obtain informed consent is not a threat to our citizens' enjoyment of ordered liberty, even when the doctor is employed by the state. Although the failure to obtain informed consent necessarily throws some doubt on the voluntariness of the patient's participation in a research study, such a failure does not raise the specter of the type of involuntary, non-therapeutic experimentation which shocked the nation after World War II and gave rise to the Nuremberg Code. The significant difference in kind noted by the *Bibeau* court justifies, if not compels, a finding that the wrongful conduct alleged by plaintiffs does not violate a right secured under the Fourteenth Amendment due process clause.

Plaintiffs' § 1985 claim turns on the allegation that defendants conspired to deprive plaintiffs' decedents of their due process rights under the Fourteenth Amendment. Having found that the patients' due process rights were not violated and in light of the absence of any allegations of "racial, or perhaps otherwise class-based, invidiously discriminatory animus" on defendants' part, the Court finds that plaintiffs' § 1985 claim fails as a matter of law. *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

For all of the foregoing reasons, defendants' motion for judgment as to plaintiffs' first four causes of action is GRANTED.

## ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION

This matter comes before the Court on "Plaintiffs' Motion for Reconsideration of Order Granting Defendants' Rule 12(c) Dismissal of Plaintiffs' § 1983 Claims for Substantive Due Process." Such motions are disfavored in this district and will be granted only upon a "showing of manifest error in the prior ruling" or "new facts or legal authority which could not have been brought to [the Court's] attention earlier with reasonable diligence." Local Civil Rule 7(h)(1). Plaintiffs' have not met their burden.

Plaintiffs argue that the Court's dismissal of their § 1983 claim was manifest error because it was based on a misapprehension of the Second Amended Complaint. Plaintiffs argue that, contrary to the Court's findings, the Protocol 126 studies were non-therapeutic and that plaintiffs Couch and Fisher did not know that their decedents' were enrolled in an experimental treatment regimen. Neither plaintiffs' revised characterization of Protocol 126 nor

the testimony of Messrs. Couch and Fisher are "new facts" under Local Civil Rule 7(h)(1).

Nor would consideration of these arguments and testimony alter the Court's prior ruling. The Order of August 9, 2002, was based on the allegations contained in the Second Amended Complaint, not the unsupported arguments of counsel or evidence produced during discovery. At no point in the thirty-seven page pleading do plaintiffs suggest, much less allege, that Protocol 126 was anything other than an experimental cancer treatment regimen or that plaintiffs' decedents were not told of the experimental nature of the treatment afforded under the protocol. Rather, the Complaint shows that each and every one of plaintiffs' decedents came to a nationally-known research facility for treatment of their cancers, sometimes traveling great distances from their homes to obtain treatment at the appropriately-named Fred Hutchinson Cancer Research Center. Second Amended Complaint at ¶¶ 4, 20, 88, 89, 104, 110, 116. The Complaint asserts that defendants failed to disclose a number of important things to plaintiffs' decedents, such as the "efficacy, safety, and risks" of participating in Protocol 126, defendants' financial interests in the outcome of the experiments, and the availability of alternative treatments. Second Amended Complaint at ¶¶ 123–125. More generally, plaintiffs allege that defendants concealed "material facts relating to Protocol 126 and [their decedents'] participation in Protocol 126" and that the failure to disclose resulted in a lack of informed consent. Second Amended Complaint at ¶¶ 126–127. The entire complaint is couched in terms of the decedents' "participation in Protocol 126," with no indication that such participation was unknowing or that the protocol was anything other than an experiment designed to test new treatments for the type of cancer from which plaintiffs' decedents suffered. Finally, the Complaint acknowledges that plaintiffs' decedents signed "Consent to Participate" forms which, while not as forthcoming as plaintiffs obviously believe they should have been, informed the participants of both the experimental nature of the protocol and the hoped-for therapeutic results. Second Amended Complaint at ¶ 151.

For all of the foregoing reasons, plaintiffs' motion for reconsideration is DENIED. The allegations of plaintiffs' Second Amended Complaint do not raise, expressly or by implication, the specter of the type of involuntary, non-therapeutic research on human subjects that can give rise to a claim under § 1983. The appropriate course of action, which plaintiffs have already undertaken, would be to file a motion to amend the complaint if plaintiffs believe that, based on the testimony of plaintiffs Couch and Fisher or other evidence, they could overcome the existing deficiencies while conforming with the requirements of Rule 11.